Good morning, everyone. And just before we start, I want to mention that there will probably be times, you know, when we might be speaking over each other. And if that occurs, what we'll do is we'll just stop and try to regroup. And we want to thank you, really, we do all of us for the accommodations you have to make and you've had to make. And we all just hope you're feeling well, your families are well. And we're going to make the best of whatever we have. And we're, we're really happy that you're here. It occurred to me this morning, if you weren't, the three of us would have no job. Okay, so the case is our first case of the day is number 20 2786. It's Michael Myers versus David Gomez. And there you are, Mr. Rayfield. Good morning. Morning. Anytime you want to begin. Thank you, Your Honor may please the court Mike Rayfield on behalf of the appellant. This is an unusual case because there are a number of issues that either the state courts didn't reach or that the government doesn't actually dispute on appeal. So I think it's important to zero in on what the parties seem to agree on. And I'll start with our claim that Myers received ineffective assistance of counsel. So unlike the state courts, the government accepts the legal premise of our position, our position under Strickland prong one, which is that if my if Myers didn't interview Sherry Porter and investigate her alibi, that would be deficient performance. I want to ask you something about that. And that is this, what are we to make of the 1990 notes in the case file about Parker? Other than that, she was interviewed prior to the trial. So so we don't think that the court that the court should make make such a finding. Both Parker and Nick and Nichols, the only two people with firsthand knowledge of whether there was an interview said that it didn't happen. And both remembered a lot about the case. Did Nichols say, I'm sorry to interrupt, did Nichols say it didn't happen or he didn't recall it? I didn't think he went as far as to say it didn't happen. So he did. This is on a 2062. And we're obviously reading from Leeming's notes of his interview Nichols. And he said that there were, quote, no other witnesses interviewed. So it's I mean, it's a little bit it's a little bit unclear, but it sounds to me like he he remembered he couldn't remember Parker herself, but he could remember that the only person he interviewed was Myers's mother, at least according to the notes that Leeming took of his interview with Nichols. But we don't have an affirmative statement anywhere from Mr. Nichols saying I didn't interview Ms. Parker. Not for Mr. Nichols. So all we but based on the, you know, the statements from the two principal parties, both don't remember this interview actually happening. And in fact, when according to Myers, when he told Nichols about his alibi, Nichols said that he, quote, didn't feel safe going to Parker's home. This is at a 2077 to 78. But Mr. Rayfield, even to we would assume that neither attorney Nichols or anyone on his behalf interviewed Ms. Parker before trial. Why is it that we couldn't also assume that he he knew what she would say? And he also knew what door he would open by presenting her alibi testimony. Because if we would if we credit Mr. Let me think. If we credit Mr. Myers testimony, Nichols knew Parker would say he was at her apartment at the time of the shooting. Couldn't Nichols make some like, you know, a risk of the state calling Detective Winstead and A.S.A. Marconi to the stand? Because then, of course, they would be recounting Mr. Myers post arrest statement and it would place him at the scene of the shooting. So so there are two responses to that. First of all, what what this course is court's say, including in the Blackman case cited in our brief, that is that even if the the lawyer is is informed about the general substance of the of the alibi witnesses statement, that doesn't that doesn't substitute for the obligation to investigate and interview that that witness, the and and this case is a good illustration because, you know, yes, Myers told Nichols that that that he was with Parker at the time of the shooting. But in order for for Nichols to investigate the strength of that alibi, he had to talk to Parker. He had to say, well, what exactly what time exactly was it when you were with Myers? Where exactly was Myers when when you heard the shots fired? What was it possible for Myers to get to the crime scene if he was with you at the time of the shooting? All of those things could only came out when they when there was an evidentiary hearing. But they but but Nichols could only have understood them by interviewing Parker. Now, in the second response to your your honor's question is that is that, you know, even if there was an interview, Nichols performance would still be deficient because it's undisputed that he never gave any strategic justification, any justification at all, strategic or otherwise for declining to call Parker. And this is where the state courts really go wrong, because rather than looking at what Nichols actually said, they simply constructed rationales that might have justified. So, Mr. Rightfield, is it your position you say that Mr. Nichols never gave any strategic reason? But as we know, Mr. Nichols had passed away by the time of the evidentiary hearing here. So is it your position that any time an attorney is not available for the evidentiary hearing on the underlying ineffective assistance of counsel claim that no strategic reason is given, so the petitioner automatically wins? The petitioner doesn't automatically win, but I think the petitioner automatically, automatically, all our position is, is that you can't supply a strategic justification after the fact. That's what that would suggest that anytime the attorney is unavailable on an ineffective assistance of counsel that the was a strategic reason. That's correct. I think that is the, I mean, so two responses. I think that's correct, which is what the rule is in Harris v. Reed, which says just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer. And so, Mr. Aifield, that seems to sort of turn the presumptions in favor of reasonable performance on their head. So I don't think it does, and especially not in this case, because it's not the case here that Nichols didn't have any opportunity to explain his strategy. When Nichols spoke to Leeming about Parker in 2009, again, he said that, you know, however you read the notes, he did not recall an interview with her, and there's no, and he didn't attempt to offer any strategy for failing to call her, either when he was speaking to Myers about her. There are plenty of, there are plenty of cases where, was this the bathrobe interview with, with Mr. Nichols? Yes, that's right. And I've certainly come across a few cases, I suspect my colleagues have as well, where if you catch somebody without deep preparation about, to ask them about events of a decade or two earlier, you're not going to get much. But if you let them immerse themselves in the available files, get back in the, in the time, it would certainly be possible. Now, it's too late to do that now here, but I don't give a whole lot of weight to somebody's nearly off-the-cuff lack of recollection on something like this, especially where there is a pretty obvious explanation, as suggested by Judge Hamilton, that puts him right at the scene, right at the time. Right, but again, I think the court's cases are fairly, are fairly well established that, that, that you can't do it, that kind of post hoc rationalization for the attorney's decision. Mr. Mayfield, the case you're relying on mainly for that is Harris versus Reed, which is a pre-AEDPA case. So to go back to Judge Hamilton's question, Harris' pre-AEDPA, where the extra layer of deference and the presumption didn't necessarily apply, how do you get around AEDPA? Well, so we've also, we've cited two cases for this, one of which is an AEDPA decision, which is a case of Davis versus Reed, which is a pre-AEDPA standards, because the inmate there was unable to secure an evidentiary hearing on his ineffective assistance of counsel claim in the state conviction hearings. So I don't think we have said, Harris, the, the principle you're relying on is still viable in a post-AEDPA world. That, that's, that's fair, Your Honor, and I apologize for miss, misstating Davis. Do you, do you want to go on to your next, we're starting to worry about your time a bit? Yes, I do, but I just want to make one more point about this, which is that even if you disagree with me that, that we can't supply a post hoc rationalization for the decision not to interview, we certainly can't apply such a rationalization for the decision not, I'm sorry, even if you disagree with me about the decision to call Parker, we still can't, there still has to be an independent justification for the decision not to interview Parker. And keep in mind that none of the state courts have found, the state courts expressly declined to find that there was an interview. So this, I don't think this court can make such a finding for the first time. And so I think the court has to, at the very least, assume that there was no interview. And because Nichols did not justify that, that decision, not to, not to conduct an investigation, that is a threshold constitutional violation, regardless of whether you agree with my argument under, under, under Harris v. Reed. So I will, I do want to briefly address the perjury claim, if I may. The, this claim also, I think, turns on mostly factual disputes, the first of which is whether Myers fairly presented the claims of the state courts. And we, you know, we've, the parties have submitted some supplemental letter, letters on this. And I think that what this dispute boils down to is the government is, is, is citing a principle that when you present your, a perjury, a constitutional claim for the first time in a, in a state petition for rehearing, that is not enough to fairly present the claim. But here, here, the judge, after conducting a hearing on Mr. Wilson's recantation, expressly found that the prosecution did not knowingly, you know, present perjury testimony. So wouldn't that finding alone dispose of Mr. Myers' nappy claim here? So that, that finding is subject to epidepherence. And, and our argument is that it's an unreasonable determination of, of fact, because the, the, the trial court's entire rationale was that he was, was that he looked at the prosecutor, you know, heard his testimony and found it incredible that he didn't knowingly present perjury testimony. But at minimum, this, but the, the, you know, the, what the cases in this area say is that is, is the question is whether the state knew or should have known that there was perjury testimony. And what the state knew at the time of the trial was that, was that Wilson's testimony was inconsistent with his statements to both the police and the grand jury, that it was inconsistent with the testimony of the state's own detective who said that Wilson could not possibly have seen from his vantage point, which in turn was photographed by the state's attorneys. And it was, and his testimony was inconsistent, it was inconsistent with all of the other witnesses who said that other than Young, the shooter's faces were covered. So, so we think that the state court's decision in this respect is an unreasonable determination of fact. And unless the court has any questions, I'll reserve the remainder of my time. All right. And I'll give you your full three, you know, the full three that you asked for. Thank you, Your Honor. All right then, Mr. Fisher. Good morning, Your Honors. Counsel, may I please the court, Assistant Attorney General, Garson Fisher for the respondent. Your Honors, I will also begin by addressing petitioners ineffective assistance of counsel claim, which does proceed from an erroneous presumption that counsel did not investigate Parker prior to trial. In fact, the record strongly suggests the contrary to be true. Indeed, post conviction counsel moved to withdraw after reviewing the public defender's offices trial file and seeing the notes of a pre-trial interview conducted with Parker that did not indicate that she was with petitioner at the time of the Will you help me with this, please? Because I, I just don't know when, if ever an attorney can make a sound, a really sound strategic assessment, not to call a witness without first interviewing or assessing how credible she is, how well she might present herself on a witness stand. Look, I will grant that Mr. Nichols was aware of Ms. Parker and understood probably the gist of, you know, her perspective testimony, but could he really legitimately, do you think, assess the pros and cons of her testimony without ever having spoken to him? Um, well, your honor, again, to be sure that the notes don't indicate who conducted an interview with her. And certainly Mr. Leeming didn't have any firsthand knowledge that counsel had conducted the interview. Um, it is certainly the most reasonable presumption to conclude that, uh, petitioners appointed public defender at trial was familiar with, um, an interview that memorialized in his office, his own offices, um, trial file also. Um, and to be clear that the respondent does not concede that, uh, that a defense counsel can never make a reasonable, reasonable strategic decision not to investigate a specific avenue of defense. So, um, it is familiarity with Parker that he was making a reasonable trial decision not to call her. Um, but, uh, his decision about how much time or effort to dedicate to investigating a, an alibi, um, defense in this case would have been reasonable anyway, because as you alluded to, uh, petitioners own pretrial statements would have contradicted, um, any, any alibi witness he had attempted to present. And in this case, he was, uh, presented with an alibi witness that would have depended on a single, excuse me, an alibi defense that would have depended on a single alibi witness with a close personal relationship with petitioner. And it admitted history of daily drug use at the time of the, uh, at the time of the crime. But did he know about the drug usage at the time? I thought that was something that came up when detective Brannigan interviewed her in 2002. I didn't think that was something that he was aware of in 1990, or that's in the record. I apologize, your honor. I agree that that as well as, um, Parker's inability to, to, uh, consistently testify as to certain key details of the alleged alibi were things that, uh, came out in post-trial investigation. Um, they certainly suggest that, uh, Parker might not have been able to present credible testimony, even if she had been called, but, um, but, but yes, your honor, I, my point about how much effort he, he would have, uh, given to investigating a potential alibi, uh, defense rests primarily on the fact that before trial that exculpated him from the shooting, but nevertheless placed him at the scene and would have, would have contradicted, um, any alibi defense. Um, nevertheless, uh, counsel did, uh, add, um, Parker to his list of potential witnesses that he presented to the state and the court. He subpoenaed her to be present. He, he had her available as an option. If he had made the decision during the course of proceedings, that that was the direction he wanted to go. His strategy, clearly from the record, we're not asking to, to, to guess here. His strategy clearly was to, to undermine the credibility of the state's eyewitnesses who identified the petitioner. Um, and he did that vigorously, particularly in his cross-examination of Deanda. Um, I apologize, your honors. I don't know how he pronounces his name, but, um, so I think the state court made the state post-conviction court made a finding that council did investigate Parker and then made a reasonable strategic decision not to call her. Um, this court obviously views those, uh, holdings and findings through the lens of 2254 D. And as judge Hamilton alluded to, it would turn the presumptions of both 2254 D and Strickland on their head based on this record to conclude that the state court had been objectively unreasonable when it concluded that, uh, council made a reasonable strategic decision not to call Parker. Moreover, petitioner can't satisfy the prejudice prong of Strickland in this case, um, for many of the same reasons because, um, uh, Parker's been, uh, contradicted by petitioner's own pretrial statement because of her close relationship, um, with, uh, petitioner, um, because of the weaknesses that while we weren't council wasn't aware of at the time, we know from her post-trial statements do exist in her, uh, her recall of the event. Um, there's no reasonable probability that, uh, that the juries would have reached a different verdict had it heard from this single, um, readily impeached alibi witness. So in some, both because, um, the trial courts, uh, excuse me, the, the state courts, uh, holding that, um, that council was engaged in real reasonable strategic decision-making when he chose not to call Parker is not objectively unreasonable and because petitioner can't the prejudice prong of Strickland, um, the, the state court's rejection of this ineffective assistance of council claim, uh, was a reasonable one and petitioner is barred from re-litigating it here, uh, on 2254D review. Um, and if your honors don't have further questions about the ineffective assistance of council claim, uh, for a respondent, I will briefly address the NAPU claim. Um, the NAPU claim is procedurally defaulted. Um, it's important to note that, um, actual innocence is an independent standalone basis for relief under Illinois post-conviction law, um, including a number of cases that rely on witness recantation. Um, it is plain that, that petitioner was raising a, an actual innocence claim, um, in the post-conviction trial court, uh, when he discussed, uh, Deanda's recantation, um, and that the state trial court was deciding an actual innocence claim, um, as was the state appellate court. Um, now to the extent that the proposed pro se, uh, supplemental brief that, um, was submitted as part of petitioner's, uh, uh, supplemental authority in the past week, um, demonstrates that that petitioner attempted to raise this claim in the appellate court, uh, the appellate court denied leave to file that petition, um, expressly relying on Illinois' rule against hybrid representation. But given the references to perjury in the post-convince, uh, conviction petition that he did file in, in 1995 and the references to perjury in the post-conviction judge's decision, can we really find he didn't present a NAPU claim to the state court, especially, um, if the principal appellate briefs are missing as we learned, uh, in the 20HA that, uh, you know, we received? Well, your honor, um, a couple of points in response to your question, your honor. First, um, the case law that petitioner relied on in his counsel post-conviction and his counsel appeal was case law that applied Illinois' actual innocence standard, um, as opposed to the federal NAPU standard. Um, so, so it did not present the state courts with an actual opportunity to address the claim that petitioner now raises in, in federal court. Um, as to the, the claim raised in his counseled appellate briefs, uh, petitioner himself in the pro se brief, uh, alluded to the fact that these claims, that this NAPU claim was not raised and, and complained to the fact that this NAPU claim was not raised in the counsel briefs. Um, so, uh, so, so in fact, the supplemental authority confirmed, uh, albeit on a different, um, ground than the one that was, uh, argued in the briefs, um, the, the procedural default. Um, but it, it is also worth noting as your honor pointed out, uh, that the claim fails on the merits, uh, two of petitioners, uh, co-defendants did raise NAPU claims. Um, they actually received relief on actual innocence claims based on the recantation, but their NAPU claims were rejected and they were rejected because the state trial court, uh, found credible, um, counsel, uh, the prosecutor's testimony, excuse me, uh, that he believed DeAnda was telling the truth at the time he elicited, uh, the testimony. And in fact, he identification of petitioner was truthful because unlike his co-defendants, uh, petition, the identification of petitioner was, um, corroborated by AW's testimony that petitioner was one of, uh, the five men who left her apartment armed with black, uh, caps, uh, on their, their heads and So are you saying, forgive me, are you saying that AW's testimony, uh, would have been enough, uh, Mr. Uh, Myers absent Mr. Wilson's, uh, testimony. I mean, she didn't see the actual shooting. And so, uh, uh, wasn't Mr., uh, Wilson, you know, critical as a witness and, and, and if the recantation raised the doubt as to some of the six defendants, he said he didn't identify why not as, you know, to all six other than, I guess, you know, I mean, he said the same thing other than about Kevin Young. He didn't, he, he, he didn't see who those shooters were other than Young, right? Your Honor, um, if I can make several points in response, um, my initial point at this moment went to, um, the role that AW's corroboration would have played in the prosecutor believing that DeAnda was telling the truth when he testified. Um, but as to, and if you look to the question of NAPU's, uh, uh, third prong, um, as to whether, uh, DeAnda's testimony was relevant to the verdict here, um, there were multiple eyewitnesses who identification aside consistently described the events of the crime. Um, and, uh, the issue really with DeAnda's testimony was that he was the witness who identified petitioner specifically as, as having fired shots. Um, but he was already vigorously cross-examined about the reliability of that testimony at trial with his pretrial statements that were inconsistent. Um, his post-trial recantation, both the state courts and this court have held post-trial recantations are, uh, suspect in and of themselves, um, certainly further calls into question the credibility of what he saw at the time of the shooting. But in, when it comes to whether AW was one of the people who fired the shot, when we have multiple witnesses who I would say there were, there were these multiple shooters dressed the same way with their faces covered shooting at the same victim. The fact that AW identified a group of fellow gang members who left her apartment armed, dressed consistently with the shooters to go exact revenge, albeit in a case of mistaken identity for this sexual assault that happened a couple of days earlier, um, does sufficiently identify petitioner as one of the people involved. And that's why in fact, the state courts reached different conclusions as to the actual innocence claims. Um, you know, the actual innocence claim is obviously not a a basis for habeas relief in this court, but it is notable that only the two defendants who were not identified by AW received relief based on DeAnda's recantation in the state court, because AW's identification did supply that missing piece of who was, who the shooters were. And there was, um, consistent additional testimony that corroborated DeAnda's general testimony as to what happened, um, about the shooting. Um, your honors, I see that I'm out of time. So unless you have any further questions, we ask that this court, uh, affirm the judgment of the district court denying habeas relief. Thank you. Thank you, Mr. Fisher. Mr. Rayfield has three So my, my colleague had mentioned, uh, going back to the ineffective assistance claim, my colleague mentioned the idea that the state courts found that there, that, that Nichols had conducted an investigation into the, into the alibi that, that respectfully is not what the state courts found after a full blown evidentiary hearing. The state court expressly assumed that Nichols quote, never interviewed Parker that's SA62. So I think the court has to make that same on, on appeal now. And I just want to address the interview notes because, you know, you know, setting aside the fact that we don't know who took the notes, we also don't know if, if Nichols was ever actually informed about the substance about even the substance of the interview. And if you actually look at the notes, you know, my, I agree with my colleague, they don't even suggest that Parker was asked about, about Meyer's alibi. And, and so, and so even if Nichols was somehow informed about the substance of the notes, the notes don't really get us anywhere. They don't, they don't suggest that, that Nichols was actually informed about the substance of the alibi. And in fact, he couldn't remember any such alibi when he was asked to pass about it, albeit, you know, 20 years later. Um, and I just wanted to, and finally, I just wanted to drill into the, to the, to the strategy aspect of this. So even if you, even if you could, um, presume that there, that Nichols based his decision not to call Parker on, on the post arrest statements and, and the, and, and, and that strategy, that, that doesn't excuse the failure to, to interview Parker. And if Parker had been called, Meyer's trial would have looked completely, would have looked completely different. At the actual trial, the jury only heard one story, that Myers was present at the shooting and at the apartment with A.W. before and after the shooting. If Parker had testified, the jury would have heard Meyer's side of the story, that he was with Parker 300 feet away from the crime scene at the time the shots were fired and therefore couldn't have been involved. Now we're... And it wouldn't have also, and if in that scenario, it also would have heard his pre-trial or his post arrest statements, right? That's absolutely correct. And we're not saying... And so it, it does seem that for us to find this ineffective, it seems like we'd have to be saying that it was ineffective not to pursue inconsistent strategies. What am I missing here? It was ineffective not to get an understanding of what those, of what those two strategies were so that council could make an informed decision. I mean, we're not saying that Parker's testimony would have been anything close to perfect, but the government's witnesses had similar or worse flaws. The government's star witness, you know, contradicted what he said to both the police and the grand jury. And his, his testimony was inconsistent with the state's own detectives. And the only other person who and the grand jury that she didn't see any of the defendants that night. So what we would have left with is a swearing match between flawed witnesses and the jury would have had to decide which one to believe. And in that circumstance, at the, at the very least, what council has to do is talk to the, the, the alibi witness and assess the strength of her, of, of her, of, of her alibi testimony. It's... Ordinarily, I would find it pretty easy to agree with that proposition, Mr. Rayfield. I have, I'm, what, what troubles me here, and I just invited at least one more comment upon it on your part, is that in essence, we know, and I think we have to assume that Nichols knew that the, that Parker's alibi was going to conflict with what Myers himself had told the police, at least according to them. And I think in all of the... That, that's a, that's a very unusual kind of alibi where you contradict the, the defendant himself. In, in all of the cases we cite in our brief, including in the Blackman case, the, the court acknowledges that the alibi witnesses would, would have had vulnerabilities. I mean, I'll just... That's, vulnerabilities, yes. Contradicting the defendant himself is what seems unusual here. Well, just to, just to drill, drill in on that factual point, the defendant himself denied that he made those post-arrest statements. And, and, and Agent Winstead did not have any, any record of those statements. So again, that would have been sort of another, another kind of swearing match in, in this case. But the point is, is that, you know, we can, we can, after the fact, try to figure out what the best strategy was for Nichols to pursue. But without interviewing Parker, Nichols could not have made a reasonable decision about whether, about, about whether the costs outweigh the benefits of, of, of, of, of calling. And that's what these cases say you have to do, separate and apart from the strategy of the, the strategic basis of whether, the strategic decision of whether to actually call the witness. And unless the court has any questions, I really appreciate the, the, the extra time and it's... Well, not as much as we appreciate the fact that you and your law firm took on this case pro bono and really did a very fine job for your client. The court thanks you. And of course, Mr. Fisher, the court always thanks your office for the fine job it does. So the case will be taken under advisement.